FILED

NOV 21 2005

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROCHESTER DRUG CO-OPERATIVE, INC., on behalf of itself and all others similarly situated, 50 Jet View Drive, Rochester, NY 14624, <br><br> Plaintiff, <br><br> v. <br><br> WARNER CHILCOTT PUBLIC LIMITED COMPANY, WARNER CHILCOTT HOLDINGS COMPANY III, LTD., WARNER CHILCOTT CORPORATION, WARNER CHILCOTT (US) INC., GALEN (CHEMICALS) LTD., and BARR PHARMACEUTICALS, INC., <br><br> Defendants. | CASE NUMBER   1:05CV02257 <br><br> JUDGE: Colleen Kollar-Kotelly <br><br> DECK TYPE: Antitrust <br><br> DATE STAMP: 11/21/2005 <br><br> JURY TRIAL DEMANDED |

**JURY ACTION**

### CLASS ACTION COMPLAINT

Plaintiff Rochester Drug Co-Operative, Inc. ("RDC" or "Plaintiff"), on behalf of itself and all others similarly situated, brings this Class Action Complaint ("Complaint") against the defendants identified in the caption, and alleges as follows:

### I. NATURE OF THE ACTION

1.   This is a civil antitrust action seeking treble damages arising out of the unlawful actions of defendants Warner Chilcott Public Limited Company, Warner Chilcott Holdings Company III, Ltd., Warner Chilcott Corporation, Warner Chilcott (US) Inc., and Galen (Chemicals) Ltd. (collectively "Warner Chilcott"), and its co-conspirator Barr Pharmaceuticals, Inc. ("Barr"). All defendants will be referred to collectively as "Defendants."

2. Warner Chilcott and Barr are sellers of prescription drugs. They unlawfully agreed not to compete for sales of the oral contraceptive, Ovcon® 35 ("Ovcon") and its AB-rated generic equivalents (collectively, "the Ovcon molecule"), and to allocate the entire United States market for the Ovcon molecule to Warner Chilcott.

3. Warner Chilcott has sold Ovcon since 2000. Ovcon is a frequently prescribed oral contraceptive used to prevent pregnancy. Barr is the only company approved by the United States Food and Drug Administration ("FDA") to sell an AB-rated generic version of Ovcon in competition with Warner Chilcott's branded Ovcon.

4. Prior to the challenged agreement, Barr had planned to compete with Warner Chilcott by selling Barr's substantially lower-priced generic Ovcon once Barr received final FDA approval. Both Warner Chilcott and Barr predicted that the entry of Barr's lower-priced generic into the market would reduce Warner Chilcott's higher priced branded Ovcon sales by capturing approximately 50 percent of Ovcon's business in the first year alone.

5. To forestall this threat and to protect its Ovcon sales and profits, Warner Chilcott entered into an agreement with Barr preventing entry of Barr's generic Ovcon into the United States market, at least since April 2004. In exchange for Barr's agreement to keep its generic Ovcon off the market for 5 (five) years, Warner Chilcott paid Barr $20 million (the "Agreement").

6. As alleged below, Defendants' Agreement is a naked restraint of trade among horizontal competitors, and accordingly, constitutes a *per se* violation of Section 1 of the Sherman Act. As a result of the Agreement, there is no generic competition for Ovcon, which could have begun to occur in April 2004 when Barr received final FDA approval to market its AB-rated generic version of Ovcon. Absent Defendants' illegal Agreement, Barr would have sold its generic version

2

of Ovcon in the United States since at least April 2004, at prices significantly lower than the price of brand-name Ovcon. Thus, Defendants' Agreement caused Plaintiff, and other similarly situated entities that have purchased Ovcon directly from Warner Chilcott, to incur substantial overcharges because, absent the Agreement, these entities would have: (a) substituted Barr's cheaper generic version of Ovcon for all or much of their purchases of brand-name Ovcon; and/or (b) paid substantially less for brand-name Ovcon.

## II. JURISDICTION AND VENUE

7. This Class Action is instituted under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including a reasonable attorneys' fee, for the injuries sustained by Plaintiff and members of the Class resulting from violations by the Defendants, as hereinafter alleged, of Section 1 of the Sherman Act, 15 U.S.C. § 1. The jurisdiction of this Court is based upon 28 U.S.C. §§ 1331 and 1337(a) and 15 U.S.C. § 15.

8. The Defendants named herein are found or transact business within this district, and the interstate trade and commerce, hereinafter described, was carried out, in substantial part, in this district. Venue, therefore, is appropriate within this district under 15 U.S.C. § 22 and 28 U.S.C. § 1391(b) and (c).

## III.   THE PARTIES

9. Plaintiff RDC is a pharmaceutical wholesaler located at 50 Jet View Drive, Rochester, New York. RDC purchased the prescription drug Ovcon directly from one or more named Defendants during the Class Period, as defined below.

10. Defendant Warner Chilcott Public Limited Company (formerly Galen Holdings PLC), is a privately-owned, for-profit company organized, existing and doing business under and by

3

virtue of the laws of Northern Ireland, with its office and principal place of business located at Old Belfast Road, Millbrook, Larne, BT40 2SH, County Antrim, United Kingdom.

11.  Defendant Warner Chilcott Holdings Company III, Ltd. is a privately-owned, for-profit company organized, existing, and doing business under and by virtue of the laws of Bermuda, with its office and principal place of business located at 100 Enterprise Drive, Rockaway, New Jersey 07866-2129.

12.  Defendant Warner Chilcott Corporation is a wholly-owned indirect subsidiary of Warner Chilcott Holdings Company III, Ltd. and is the direct 100% shareholder of Warner Chilcott (US) Inc. Warner Chilcott Corporation is organized, exists, and does business under and by virtue of the laws of the State of Delaware, with its office and principal place of business located at 100 Enterprise Drive, Rockaway, New Jersey 07866-2129.

13.  Defendant Warner Chilcott (US) Inc., a wholly-owned subsidiary of Warner Chilcott Corporation. Warner Chilcott (US) Inc., is organized, exists, and does business under and by virtue of the laws of the State of Delaware, with its office and principal place of business located at 100 Enterprise Drive, Rockaway, New Jersey 07866-2129.

14.  Galen (Chemicals) Ltd., is organized, exists, and does business under and by virtue of the laws of the Republic of Ireland. Galen Chemicals is directly or indirectly owned or controlled by Warner Chilcott Holdings Company III, Ltd.

15.  Defendant Barr is a corporation organized, existing, and doing business under and by virtue of the laws of the State of Delaware. Barr's office and principal place of business is located at 2 Quaker Road, P.O. Box 2900, Pomona, New York 10970-0519.

4

## IV. CLASS ACTION ALLEGATIONS

16. Plaintiff brings this action on behalf of itself and, under Rule 23(b)(3) of the Federal Rules of Civil Procedure, as representative of a class defined as follows:

> All persons or entities who have directly purchased Ovcon from any Warner Chilcott entity at any time during the period of April 22, 2004, through and including the present (the "Class"). Excluded from the Class are Defendants and their officers, directors, management and employees, subsidiaries or affiliates.

17. Members of the Class are so numerous that joinder of all members is impracticable. Class members include wholesalers, hospitals, health maintenance organizations, and/or retail chain drug stores. Upon information and belief, the class includes one-hundred or more members, and the exact identity of Class members is ascertainable from the records of Defendants.

18. Plaintiff's claims are typical of the Class. Plaintiff and all members of the Class have incurred overcharges because they were deprived of the ability to substitute a cheaper generic version of Ovcon and/or pay substantially lower prices on their purchases of Ovcon as a result of the wrongful exclusion of Barr's AB-rated generic Ovcon product.

19. Plaintiff will fairly and adequately represent the interests of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the Class.

20. Plaintiff is represented by counsel who are experienced and competent in the prosecution of complex antitrust class actions, particularly antitrust class action litigation relating to the pharmaceutical industry.

21. Questions of law and fact common to the members of the Class predominate over questions, if any, that may affect only individual Class members because Defendants have acted on grounds generally applicable to the entire Class.

22. Questions of law and fact common to the Class include:

a. the existence and duration of the contract, combination or conspiracy in restraint of trade alleged herein;

b. whether the contract, combination or conspiracy alleged herein constitutes a *per se* violation of Section 1 of the Sherman Act;

c. if the contract, combination or conspiracy alleged herein does not constitute a *per se* violation, whether it otherwise represents an unreasonable restraint of trade under Section 1 of the Sherman Act;

d. whether the activities of Defendants as alleged herein have substantially affected interstate commerce;

e. whether, and to what extent, the conduct of Defendants caused antitrust injury to the business or property of Plaintiff and the members of the Class, and if so, the appropriate measure of damages.

23. Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

24. Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## V. FACTUAL BACKGROUND

### A. Federal Regulations

25. In 1984, Congress enacted the Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984) (the "Hatch-Waxman Amendments"), amending the Federal Food, Drug, and Cosmetics Act, 21 U.S.C. §§ 301-392. Under the Food, Drug, and Cosmetics Acts, pioneer drug manufacturers must obtain FDA approval for any new drug by filing a New Drug Application ("NDA"), which requires the submission of specific data concerning the safety and effectiveness of the drug, as well as any information on applicable patents.

26. A company seeking FDA approval to market a new drug (i.e., a branded drug) must file a New Drug Application (NDA) demonstrating the safety and efficacy of its product. 21 U.S.C. § 355(b).

27. An "AB-rated" drug is one that the FDA has determined to be bioequivalent to a branded drug. A generic drug is considered bioequivalent to a branded drug if it contains the same active pharmaceutical ingredient as the branded drug, and if there is no significant difference in the formulation, quality and effectiveness of the two drugs. 21 U.S.C. § 355(j)(8)(B).

28. A company seeking to market an "AB-rated" generic version of a branded drug may file an Abbreviated New Drug Application (ANDA) with the FDA. 21 U.S.C. § 355(j).

29. Typically, when generic versions of brand-name drugs finally are permitted on the market by the FDA, they are priced significantly less than their brand-name counterparts. As a result, upon generic entry, direct purchasers (Class members) rapidly substitute generic versions of the drug for some or all of their purchases. As more generic manufacturers enter the market, prices for generic versions of a drug predictably plunge even further. This price competition enables all

7

direct purchasers of the drugs to: (a) purchase generic versions of the drug at substantially lower prices, and/or (b) purchase the brand-name drug at a reduced price. Generic drugs, after their introduction, promptly capture a significant share of their branded counterparts' sales, causing a significant reduction of the branded drug's unit and dollar sales. Consequently, brand-name drug manufacturers have a keen financial interest in delaying the onset of generic competition, and purchasers experience substantial price inflation from that from that delay.

**B.    Warner Chilcott's Ovcon Oral Contraceptive**

30.    Ovcon was originally approved by the FDA in 1976, and it is not subject to patent protection. Warner Chilcott acquired Ovcon from Bristol-Myers Squibb Company and/or its affiliates or subsidiaries on January 26, 2000. As part of the acquisition, Bristol-Myers Squibb Company agreed to supply (and has supplied) Ovcon to Warner Chilcott.

31.    Ovcon's net U.S. dollar sales have more than doubled since 2000, even as Warner Chilcott has raised Ovcon's price.

32.    Ovcon is, and has been, one of Warner Chilcott's highest revenue-producing products.

33.    Warner Chilcott has sold Ovcon at prices substantially above Warner Chilcott's cost of acquiring and distributing the product.

34.    Ovcon is highly profitable for Warner Chilcott. For the twelve months ending September 30, 2004, Warner Chilcott's net sales of Ovcon in the United States were approximately $71.5 million.

### C. The Threat Posed to Warner Chilcott by Entry of Barr's Generic Ovcon

35. In September 2001, Barr filed a Paragraph I Certification ANDA with the FDA for approval to manufacture and sell an AB-rated generic version of Ovcon, on the basis that no patent for the pioneer drug (Ovcon) had been listed in the FDA's publication entitled "Approved Drug Products with Therapeutic Equivalence Evaluations," known as the "Orange Book."

36. In January 2003, as reported by several news publications, including the Guardian (UK), Barr publicly announced its intention to market generic Ovcon by the end of 2003.

37. Barr planned to price generic Ovcon at approximately 30 percent less than the price that Warner Chilcott charges for branded Ovcon.

38. Barr projected that its generic Ovcon would capture approximately 50 percent of Warner Chilcott's branded Ovcon sales within the first year of introduction.

39. Warner Chilcott expected that Barr would price its generic Ovcon at approximately 30 percent less than the price Warner Chilcott charges for branded Ovcon.

40. Warner Chilcott projected that generic Ovcon would capture at least 50 percent of Ovcon's new prescriptions within the first year of introduction. Warner Chilcott calculated that, as a result of these lost prescriptions, its net revenues from the sale of branded Ovcon would decline by at least $100 million over a three year period subsequent to generic entry.

41. Warner Chilcott had planned to protect its Ovcon revenues from generic competition by introducing a chewable form of the product (Ovcon Chewable) before generic Ovcon entry occurred. Warner Chilcott's strategy was to convert Ovcon patients to Ovcon Chewable, and to stop selling Ovcon once conversion was substantially complete. This is known as a "line extension" strattegy. The January 17, 2003 publication of the Irish Times quotes a Galen spokesman as saying:

9

"At some stage there was going to be generic competition to Ovcon, which is why we took the step of filing the line extension."

42. Prescriptions for Ovcon Chewable would not be able to be filled at the pharmacy with a generic Ovcon product (absent express approval of the patient's physician), because any generic version of Ovcon would not be AB-rated to Ovcon Chewable.

43. By mid-2003, however, Warner Chilcott's "switch" strategy to protect its Ovcon revenues -- by converting customers to Ovcon Chewable before generic Ovcon entry -- was in jeopardy. Warner Chilcott's planned Ovcon Chewable had not obtained FDA approval by the time that Barr's generic Ovcon entry appeared imminent.

44. In May 2003, Warner Chilcott's chief financial officer warned the company's Board of Directors that generic Ovcon entry was the "biggest risk to the company."

### D. The Defendants' Horizontal Agreement Not to Compete

45. By the summer of 2003, Warner Chilcott believed that Barr's generic Ovcon entry could occur as early as September of that year.

46. In August 2003, Warner Chilcott and Barr discussed a possible business arrangement under which Barr would agree to refrain from competing in the United States with its generic Ovcon product.

47. On September 10, 2003, Warner Chilcott and Barr executed a letter of intent. According to the letter of intent, Warner Chilcott would pay Barr $20 million in exchange for Barr's agreement not compete in the United States for five years with its generic Ovcon product when Barr received final FDA approval. Instead of entering and competing, Barr would agree to be available as a second supplier of Ovcon to Warner Chilcott if Warner Chilcott so requested.

48. On March 24, 2004, the Defendants signed their Final Agreement implementing the letter of intent. Warner Chilcott paid Barr $1 million upon signing the Final Agreement.

49. Under the Final Agreement, within 45 days after the FDA approved Barr's generic Ovcon ANDA, Warner Chilcott could elect to pay the remaining $19 million to secure Barr's agreement to refrain from marketing generic Ovcon in the United States, either by itself or through a licensee, for five years. The Final Agreement referred to this arrangement as Warner Chilcott's option to an exclusive license to Barr's ANDA for generic Ovcon.

50. In addition, the Final Agreement gave Warner Chilcott the ability to purchase Ovcon supply from Barr, pursuant to specified payment terms, including setting a premium price for Barr's generic Ovcon of up to 200% of Barr's manufacturing costs. The ability to purchase supply from Barr would arise, however, only after Barr received final FDA approval for its generic Ovcon. Both Warner Chilcott and Barr understood that if, upon receiving FDA approval, Barr went ahead and entered the market with its generic Ovcon product, Warner Chilcott's Ovcon supply needs would immediately be drastically reduced.

E. **The Defendants Carry Out Their Horizontal Agreement Not to Compete**

51. On April 22, 2004, the FDA approved Barr's ANDA to produce and market generic Ovcon.

52. But for the agreement, upon receiving final FDA approval for its generic Ovcon ANDA, Barr would have marketed generic Ovcon in the United States immediately.

53. On April 23, 2004, Barr publicly announced its intention to market generic Ovcon if Warner Chilcott chose not to exercise its exclusive license option.

11

54. On May 6, 2004, Warner Chilcott exercised the exclusive license option under the Final Agreement by paying Barr $19 million.

55. Warner Chilcott did not begin purchasing Ovcon supply from Barr at that time, but instead continued to purchase Ovcon supply solely from Bristol-Myers Squibb Co., until about May 2005.

56. Under the terms of the Final Agreement, Barr cannot sell generic Ovcon in the United States for five years, or until approximately May 2009. Absent its agreement not to compete with Warner Chilcott, Barr would have started selling generic Ovcon shortly after receiving final FDA approval in April 2004.

57. Entry of Barr's generic Ovcon into the United States would have quickly and significantly reduced the sales of Warner Chilcott's branded Ovcon, and led to a significant reduction in the average price Plaintiff and the Class paid for Ovcon molecule products.

58. Barr has abided by its agreement not to sell generic Ovcon in the United States.

59. As of the date of this Complaint, Barr remains the only company that has received approval from the FDA to make and sell an AB-rated generic version of Ovcon.

60. On November 7, 2005, the FTC filed a complaint against Defendants in the United States District Court for the District of Columbia, seeking to permanently enjoin Defendants from continuing to engage in their unlawful conduct. Twenty-one states and the District of Columbia have filed a related complaint in federal court.

## VI. TRADE AND COMMERCE

61. At all material times, Ovcon was marketed by Warner Chilcott, shipped across state lines, and sold to customers located outside the state of its manufacture.

62. During the relevant time period, in connection with the purchase and sale of Ovcon, monies as well as contracts, bills and other forms of business communication and transactions were transmitted in a continuous and uninterrupted flow across state lines.

63. During the relevant time period, various devices were used to effectuate the conspiracy alleged herein, including the United States mail, interstate and foreign travel, and interstate and foreign telephone commerce. The activities of Defendants as charged in this complaint were within the flow of, and have substantially affected, interstate commerce.

## VII. EFFECTS ON COMPETITON

64. Defendants have undertaken the foregoing unlawful courses of conduct for the following purposes and with the following effects:

   a. The sales of Ovcon and any AB-rated generic equivalent have been allocated between Warner Chilcott and Barr, with a portion of Warner Chilcott's supra-competitive profits being allocated to Barr, in exchange for its agreement not to compete with Warner Chilcott;

   b. Prices for Ovcon and any AB-rated generic equivalent have been fixed, raised, maintained or stabilized at artificially high and non-competitive levels;

   c. Class members have been deprived of the benefits of free and open competition in their purchases, including the ability to purchase a competing, less expensive generic version of Ovcon; and

   d. Competition in the production and sale of Ovcon and any AB-rated generic equivalent has been restrained, suppressed and eliminated.

13

## VIII. DAMAGES TO MEMBERS OF THE CLASS

65.  During the relevant period, members of the Class purchased substantial amounts of Ovcon. As a result of the illegal conduct of Defendants, members of the Class were compelled to pay, and did pay, artificially inflated prices for the Ovcon molecule. Those prices were substantially greater than the prices that members of the Class would have paid absent the illegal Agreement, combination or conspiracy alleged herein, because Class members were deprived of the opportunity to: (1) pay lower prices for the generic version of Ovcon; (2) pay lower prices for their Ovcon molecule requirements by switching more of the volume of their purchases from the brand to the generic versions; and (3) pay lower prices for the brand drug Ovcon.

## IX. VIOLATIONS ALLEGED

### Count I (against all Defendants)
### Violation of Section 1 of the Sherman Act

66.  Plaintiff incorporates by reference the allegations set forth above, as if fully set forth herein.

67.  Beginning on or about September 10, 2003, when Defendants executed their letter of intent, Defendants engaged in a continuing agreement, combination or conspiracy in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

68.  The Defendants' Agreement has included concerted action and undertakings between Defendants for the purpose and effect of: (1) eliminating competition between Warner Chilcott and Barr in the sale of Ovcon molecule products; (2) allocating a portion of Warner Chilcott's supra-competitive profits in the sale of Ovcon to Barr in exchange for Barr's agreement not to sell its generic version of Ovcon for five years; (3) fixing, raising, maintaining, or stabilizing the price of

14

branded Ovcon at supra-competitive levels; and (4) depriving Plaintiff and the Class of the ability to purchase cheaper competitive generic versions of Ovcon.

69. For the purpose of formulating and effectuating their contract, combination or conspiracy, Defendants performed various acts, as alleged herein, including the following:

   a. entering into an illegal Agreement by which Barr agreed not to sell its generic Ovcon in U.S. commerce in exchange for sharing Warner Chilcott's supra-competitive profits, and

   b. depriving direct purchasers of the ability to purchase Ovcon generic equivalents, at true competitive prices;

   c. causing Class members to pay more for Ovcon molecule products than they otherwise would have.

70. The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination or conspiracy were authorized, ordered or done by their officers, agents, employees or representatives while actively engaged in the management of Defendants' affairs.

71. Defendants' illegal contract, combination or conspiracy to prevent the introduction into the U.S. marketplace of a competing generic version of Ovcon resulted in Plaintiff and the Class paying more than they would have paid for Ovcon and its AB-rated generic equivalents, absent Defendants' illegal conduct.

72. Defendants' contract, combination or conspiracy is a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

73. In the alternative, Defendants' contract, combination or conspiracy violates Section 1 of the Sherman Act, 15 U.S.C. § 1, under a "Quick Look" analysis and/or under "Rule of Reason" analysis, because its purpose and effect was to unreasonably restrain competition in the United States market for Ovcon and its generic equivalent.

74. To the extent the law requires it, the relevant geographic market is the United States and its territories.

75. To the extent the law requires it, the relevant product market is Ovcon and its AB-rated generic equivalents (the Ovcon molecule). Defendants had substantial market power in the relevant market.

## X. DEMAND FOR JURY

76. Plaintiff demands trial by jury on all issues so triable.

## XI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class, respectfully prays that:

a. The Court determine that this action may be maintained as a class action pursuant to Rule 23(a) and 23 (b)(3) of the Federal Rules of Civil Procedure;

bc. Each Class member recover three-fold the damages determined to have been sustained by each of them; and that joint and several judgment be entered against each defendant in favor of the Class;

c. The Class recover its costs of suit, including reasonable attorneys' fees as provided by law;

d. The Class be granted such other relief as the Court determines to be just.

Dated: November 21, 2005

STEIN, MITCHELL & MEZINES LLP
David U. Fierst, D.C. Bar #912899
1100 Connecticut Avenue, N.W., Suite 1100
Washington, D.C. 20036
Tel: 202-737-7777
Fax: 202-296-8312

BERGER & MONTAGUE, P.C.
Daniel Berger
David Sorensen
Eric L. Cramer

16

Peter Kohn
Daniel Simons
1622 Locust Street
Philadelphia, PA 19103
Tel.: (215) 875-3000
Fax: (215) 875-4671

LAW OFFICES OF JOSHUA P. DAVIS
Joshua P. Davis
437 Valley Street
San Francisco, CA 94131
Tel: (415) 422-6223
Fax: (415) 422-6433

SCHIFFRIN & BARROWAY, LLP
Kendall S. Zylstra
Lyle Stamps
280 King of Prussia Road
Radnor, Pennsylvania 19087
Tel: (610) 667-7706
Fax: (610) 667-7056